(90 South. 652)

No. 24051.

## CARTER v. MELCHIOR.

(June 30, 1921. On Rehearing, Jan. 30, 1922. On Application to Amend Judgment, Feb. 6, 1922.)

*(Syllabus by Editorial Staff.)*

On Rehearing.

**1. Divorce ☞124—Evidence held sufficient to sustain decree for defendant.**

In a husband's suit for divorce and custody of a child, on the grounds of cruelty, desertion, and adultery, evidence *held* sufficient to sustain a judgment granting defendant a separation from bed and board, custody of the child, and alimony until judgment of final divorce.

On Application to Amend Judgment.

**2. Divorce ☞287—Incorrect allowance of alimony in final judgment for divorce may be corrected as clerical error.**

The Supreme Court cannot reopen a judgment rendered on rehearing, where no reservation was made for an additional application for rehearing, such judgment being final as to the merits of the case, but, on request of both parties to a divorce suit, may correct, as a clerical error, an erroneous allowance of alimony in a sum greater than that claimed.

Provosty, C. J., dissenting.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by James Francis Carter against Inez Melchior, his wife. Judgment for defendant, and plaintiff appeals. Affirmed as amended and corrected.

E. M. Stafford and M. H. Manion, both of New Orleans, Daniel Wendling, and M. M. Boatner, of New Orleans, for appellant.

150 La.—10

Jessy Benedict Gessner and F. F. Teissier, both of New Orleans, for appellee.

PROVOSTY, J. Plaintiff filed this suit in December, 1918. He alleges that he was married to defendant in January, 1911; that there was born to the marriage a boy now six years old; that during the last six years the conduct of his wife towards him has been cruel in the extreme, the cruelties consisting in constant quarreling and bickering on her part, her sole desire being to obtain a divorce from him; that during the war she refused to sign his questionnaire unless he would consent to give her the house they lived in, and money and a divorce; that on October 15, 1918, she left the matrimonial domicile, taking the child with her, and thereafter denied to him the company of the child; that in November, 1918, she went to their house, broke open same, and took all the furniture, leaving only one iron bed without bedding; that she has done and said things which he dislikes to disclose but which he will "with sorrow in his heart" disclose if so ordered, and has constantly associated with immoral characters; that notwithstanding said acts of his wife he has been contributing not less than $60 per month towards her support, on account of the child; that she is an unfit person to have custody of the child. He prayed for a separation from bed and board, and to be awarded the custody of the child.

Defendant, in her answer, denied the cruelties; admitted having left plaintiff, alleging that it was with his consent, and that she had gone to live with relatives; alleged that her reason for refusing to sign the questionnaire was that it contained incorrect statements to which she could not subscribe; she denied the "truth of the deduction her husband draws from" her said refusal; denied his not having been allowed to see the child often; alleged that she had taken the child to his office three times a week since their

separation, which was oftener than he had seen the child when they lived together; admits taking the furniture, but says that it was with his consent, and that she left for his use an entirely equipped bed, a washstand, chairs, and an oil heater, and an art square on the floor; that she has received only $12 a week from her husband since their separation, but that he has also bought some clothes for the child; she denies having associated with immoral characters; alleges that her husband has a violent temper and habitually uses improper, vulgar, and profane language, so that he is an unsuitable custodian for the child. She prayed that the suit be dismissed.

On November 12, 1919, she filed a motion asking that he be ordered to show cause why he should not pay her alimony at the rate of $83.50 per month.

Two days thereafter he filed a supplemental petition alleging as follows:

"(1) Petitioner shows that his wife, Inez Melchior, openly and publicly boasts that she has 'a man,' and makes purchases for him; and particularly shows that during the month of October, 1919, his said wife said she was buying a necktie for her 'man,' and further boasted openly and publicly that she was getting rid of a no-account husband, referring thereby to your petitioner.

"(2) Petitioner further shows that his said wife has been guilty of acts of adultery committed with various men at various times and places; and particularly charges that on March 19, 1919, a man known as Oliver Hingle did enter the residence of petitioner's said wife at No. 4137 St. Peter street, in this city, at 9:50 p. m., and remained there until after 12 o'clock that night; that on October 25, 1919, an unknown man promenaded Canal street, in this city, with petitioner's said wife, and, after a car ride, entered the residence of petitioner's said wife, No. 4137 St. Peter street, at 6:55 p. m., while petitioner's wife and the said unknown man were the only people in the said premises, and the said unknown man there remained for hours; petitioner shows that on the occasions set forth herein his said wife committed adultery with the said men.

"(3) Petitioner further shows that his said wife has written letters to her female friends telling them how to commit abortion; which said letters petitioner will produce and exhibit at the trial of this cause.

"(4) Petitioner further shows that on account of his said wife's shameful conduct she is not a proper person to rear and care for their minor child, James Francis Carter, Jr., and that petitioner is therefore entitled to the permanent care and custody of their said minor son."

The prayer was for a divorce, for the custody of the child, and for an injunction enjoining her from bearing his name.

Defendant filed an answer to this petition denying all its averments, and alleging that all she knows of the letters in question on the subject of abortion is that at one time she did under dictation of her husband write on a piece of paper something about abortion; she alleged that he had constantly insulted, and often publicly defamed her, always wantonly and maliciously; that he had always tried to cut her off from every friend and even from acquaintances by abusing them to her and to others, by forbidding her to associate with them and insulting them; that he has constantly tried to influence her little son against her; that—

"For almost a year now that he has employed detectives to shadow her and watch her house, and follow any one who comes to her house; that they have questioned her servant and endeavored to interview her neighbors, so that it has amounted to a persecution.

"Par. 4. That in both the original and the supplemental petitions that he has made under oath and filed herein he has made false allegations against her and drawn defamatory inferences therefrom, all of which was wantonly and maliciously done with the intention of injuring his wife, and constitutes public defamation also."

She prayed that his suit be dismissed, and that she have judgment against him for separation from bed and board and for $83.50 permanent alimony, and for the custody of the child.

On December 1, 1921, the court entered a judgment condemning defendant to pay

plaintiff alimony at the rate of $10 a week beginning November 21, 1919.

On March 20, 1920, after trial, the court rendered judgment dismissing plaintiff's suit, decreeing in favor of defendant a separation from bed and board, awarding the custody of the child to defendant, and condemning plaintiff to pay defendant alimony at the rate of $25 a week from the date of the judgment and to continue until judgment of final divorce, unless a reconciliation should in the meantime have taken place. ·

Plaintiff testified that he was a "doctor of dental surgery and radiologist," and had been practicing since 1909 in the city of New Orleans; that when he requested his wife to sign his questionnaire she answered that for a long time she had been wanting to get him and that now she had him; that she would not sign unless he gave her the house and $80 a month and let her "frame" a divorce on him and not contest the case; that he made complaint to the Department of Justice, and that an agent was sent with him to investigate the matter, and that his wife made the same statement before this agent (the agent, by the way, corroborates him); that his wife removed the furniture after she had asked his consent to her doing so and he had refused; that she left "almost nothing, an iron bed and no covering"; that one of the immoral characters with whom his wife associated was her sister. (This sister is shown to have been a disreputable woman.) Plaintiff testified further:

"Q. You have alleged in your petition that Mrs. Carter boasted of having a man? A. She did.

"Q. Did·that occur in your presence, or did you make this allegation from hearsay? A. It occurred in my presence.

"The Court:

"Q. What did she say? A. She boasted to me that she had a man, and she also made some remarks about this man, that really I feel ashamed to make mention of in the presence of a lady.

"Mr. Manion:

"Q. Just in what words did she express herself about having a man, how did she say it? A. 'I don't care for you, I have got a man.' She went on to explain something else to me, which I feel ashamed to mention in court, and I'll let the judge ask me.

"Q. Did or did not Mrs. Carter ever state to you that she intended to get rid of`you? A. Constantly.

"Q. Did she make that statement to you? A. She made that statement to me, that she wanted to get rid of me, constantly.

"Q. In what words did she express herself? A. She said, 'I don't care for you. Why don't you leave home? You are not wanted around here.'

"Q. Did you ask her any reasons for that on her part? A. I asked her what was the reason, and she abused me.

"Q. You have charged Mrs. Carter with having committed adultery. Please state the place and time where the charge alleged by you occurred, if you have any personal knowledge of it? A. The charge which I have personal knowledge of was acted on the 19th of March, 1919.

"Q. Where? A. At her residence, 4137 St. Peter street.,

"Q. Were you out there, Dr. Carter? A. I went out there.

"Q. Was any one with you? A. There was some one with me.

"Q. Who? A. Anthony Rousseau and Victor Rousseau.

"Q. Anybody else? A. The detective.

"Q. What is his name? A. Julius Campos.

"Q. Did you all go out there together? A. I and the two Rousseaus went together.

"Q. Who was out there when you reached there? A. When we reached there, Mr. Campos was there.

"Q. Then what did you see? A. When we arrived there, we saw a light in Mrs. Carter's house, 4137 St. Peter street.

"Q. How long did you stay there? A. Until somewhere along 12 o'clock at night.

"Q. Was there a light in the house all the time? A. There was a light in the house when we first arrived there, but the light was put out a short while after we arrived.

"Q. Was it lighted again thereafter? A. Yes, it was; along midnight. .

"Q. Between the hour of your arrival and the hour of your leaving, did you see any one enter or leave that house? A. I saw a man leave there along about 12 or a few minutes after.

"Q. Who was with you, if any one, when the man was leaving the house around 12 o'clock at night? A. Victor and Anthony Rosseau and Julius Campos.

"Q. Did the light in the home continue out until this man departed? A. It continued out until along 12 o'clock, and the light came on for a minute, when along came a man.

"Q. When the light went out, do you mean it went out in one room, or was the whole house thereafter in darkness? A. The whole house thereafter was in darkness.

"Q. This place, 4137 St. Peter street, do you know of your own knowledge that your wife was living there at that time? A. She was living there.

"Q. Do you know who else was living in that house? A. She was living there alone with my child and had been living there for some time.

"Q. What brought you on this occasion out to the residence, 4137 St. Peter street? A. I had a telephone message calling me to go there at once, which we did.

"Q. Who was out there on the outside of the residence when you got there? A. Julius Campos was on the outside.

"Q. Dr. Carter, prior to your wife leaving the matrimonial domicile, did you and she immediately prior thereto occupy the same room? A. We did not. She occupied one room and I the other.

"Q. What occasioned your occupying separate rooms?

"Mr. Tessier: We object. There is no allegation in the pleadings to that effect.

"The Court: Let the objection go to the effect.

"A. Why, she said she didn't care for me and had another man, and moved in the other room.

"Q. From that time until now, have you and Mrs. Carter ever occupied the same bedroom? A. No, sir; never have had any relations whatsoever.

"Q. What time of the year was it that you took up separate rooms? A. That was in 1917; it was long before she ever left home.

"Q. It was immediately prior to the time, I understand, that she said she had a man? A. Yes, sir.

"Q. Now, Dr. Carter, did anything unusual ever happen one night in your bedroom? A. Yes, sir.

"Q. What was it? A. She came to my bedroom with a revolver—

"Mr. Tessier: There is no charge in the petition of an attempt to kill him. We must start at one place and stop another, and we object.

"The Court: Let the objection go to the effect.

"A. She came to my bedroom with a revolver, which she kept with her loaded constantly, to shoot me. It was after the hour of 12 o'clock. She came to my bed while I was asleep and snapped the revolver under my chin.

"Q. Go on? A. And I woke up and demanded to know what she wanted, and she went out."

Plaintiff, in his testimony, sought to show that the child had not been well taken care of, but that part of his case may be disposed of with the general statement that it has failed.

A Mrs. Hall testified that she was a saleswoman in the clothing store of Mayer Israel & Co.; that defendant, with whom she was not acquainted, came into the store, and—

"Q. What did she buy? A. She bought a tie from me. I was standing in the horseshoe with one of my fellow clerks, Mr. Tarrantino; she walked up to me and says, 'Do you sell ties?' I said, 'Yes, Madam, I do.' She said, 'Well, I want to see the finest tie you have got in the house, as it is a present for my man.' I then proceeded to show her the ties, and she selected one from me and bought it.

"Q. Did she say anything else? A. The price was $3.50 for the tie and 15 cents war tax. She gave me a $5 bill, and during the time I was turning the rack and she looking for a tie, she said, 'I have the finest looking man in town, a tall blonde.' And I made a check and the package was wrapped, and I gave her the package and her change, and I said, 'If your man was so good looking and you loved him so much, why don't you marry him?'

"Q. What was her answer? A. She said, 'That is what I am going to do when I get rid of my no-good husband.' I then said, 'Who is your husband?' She said: 'He is a dentist in the Macheca Building, Dr. Carter. Do you know him?' I said, 'Yes, I do,' and I gave her her money and the package, and she left."

Peter Tarrantino, a clerk in the same store, testified:

"Q. Do you know Mrs. Carter, who is sitting in the courtroom here? A. No, sir.

"Q. Have you ever seen her before? A. On one occasion.

"Q. When was that? A. About October.

"Q. What year? A. Last year.

"Q. October, 1919? A. Yes, sir.

"Q. Where did you see her? A. At Mayer Israel & Co.'s store.

"Q. What was she doing there? A. Purchasing a tie.

"Q. Who waited upon her? A. Mrs. Hall.

"Q. Did you overhear any conversation between Mrs. Carter and Mrs. Hall? A. Yes, sir.

"Q. State that conversation. A. Mrs. Hall and I were standing in front of the store, and a lady came up and says, 'Do you sell ties?' Mrs. Hall says, 'I do,' and started to show her the ties, and I kind of turned away, and she said: 'I want the best, good-looking tie you have got in the store. It's a present for my man.' I was still in the same position with my back turned to them, and I noticed Mrs. Hall go to the wrapping counter and come back again, and Mrs. Hall said, 'If he is good looking and you love him, why don't you marry him?' And she says, 'That is what I intend to do when I get rid of that no-good husband of mine.' Mrs. Hall asked her, 'Who is your husband?' She said: 'Dr. Carter, a dentist in the Macheca Building. Do you know him?' And I then glanced at the lady going out with the package.

"Q. You cannot be mistaken that the lady who had that conversation with Mrs. Hall was the same lady who is sitting now in the courtroom? A. The same lady.

"Q. Did you know Dr. Carter at that time? A. No, sir.

"Q. Do you know Dr. Carter? A. Yes, sir."

The detective, Julius Campos, testified that he at the time of testifying was a conductor for the New Orleans Railway Company, but was at one time a detective in the employ of the McMahon Detective Agency; that—

"A. On the 19th of March I was sent out there at 5 o'clock in the evening. There was nobody in the house at all from 5 o'clock until 10 minutes to 10. At that time Mrs. Carter and a gentleman and a little boy came walking in Carrollton avenue from Dumaine street and went into the house, and then I phoned Dr. Carter, and he came out in a machine with the two Rousseaus, and I stayed there until 10 minutes past 12 o'clock, when this gentleman came out. He walked out Carrollton to Dumaine and to St. Philip and went to No. 3326 St. Philip street.

"Q. Did you inquire who was living at 3326 St. Philip? A. I inquired the next day, and they told me Oliver Hingle. * * *

"Q. Now, Mr. Campos, where were you when this party came out of that St. Peter street residence? A. Corner of St. Peter and Carrollton avenue.

"Q. With whom were you? A. With Dr. Carter and the two Rousseaus. * * *

"Q. Before this man and Mrs. Carter with the little boy came along and went into the house, was there a light there? A. No, sir.

"Q. Was there a light there when Dr. Carter and the two Rousseaus came there? A. Yes, sir.

"Q. How long did that house remain lighted? A. Fifteen minutes after Dr. Carter got there.

"Q. And when was it again lighted? A. About 10 minutes past 12 o'clock, about 5 minutes before the gentlemen left. * * *

"A. About two years.

"Q. You have been shadowing her all along? A. Yes, sir.

"Q. How did you come to be at her residence on that particular day at 5 o'clock? A. I went there days before that time.

"Q. How far away were you when you saw this party enter the residence with Mrs. Carter? A. Right at the corner of Carrollton avenue and St. Peter.

"Q. About 100 or 200 feet from Mrs. Carter's residence? A. Yes, sir. * * *

"Q. What time was it when Dr. Carter arrived? A. Ten minutes or a quarter past 10.

"Q. You say that Mrs. Carter and this gentleman came in about 10 minutes to 10? A. Yes, sir."

Victor Rousseau testified that he is an optician in the same office with Anthony Rousseau, his brother. He testified to having gone one night to plaintiff's house with plaintiff to spend the night, and when they got there they found that all the furniture had been removed except one iron bed, a dresser, and chairs; that they slept in the bed, but, there being no covering, had to use their overcoats for covering; that on March 19, 1919, he and his brother and plaintiff went to the house of defendant and found the detective there waiting for them—

"Q. What time did you go out there? A. We got there a little after 10.

"Q. Did you notice the house occupied by Mrs. Carter? A. There was a light in the house.

"Q. Was it lighted when you got there? A.

Yes, and we stayed 15 minutes and the lights were put out.

"Q. Were all the lights put out? A. There was none in the front.

"Q. Did you notice any light at all after the front room light was put out? A. No, sir.

"Q. How long. did that house remain unlit? A. Until a few minutes after 12, and it was lit up again.

"Q. Did anybody come in or go out of that house? A. Yes, some gentleman, about 15 minutes after 12.

"Q. Where did he go? A. He walked towards Carrollton avenue and Dumaine street to catch the car.

"Q. Have you seen that man down here today? A. It looks like the fellow, but I don't know.

"Q. Then, as I understand, you have seen down here a man who looks like that individual who came out of that house on that night? A. Yes, sir.

"Q. Did anybody follow that man that came out of· that St. Peter street house? A. Yes, Mr. Campos.

"Q. Is that the same Mr. Campos the same one who testified awhile ago? A. Yes, the same one."

Anthony Rousseau, optician, testifies to the same thing. Also, that he was present when Mrs. Carter asked plaintiff permission to remove the furniture and was· refused. Miss Ethel Stevenson, employed in plaintiff's office, heard the request made by defendant to be allowed to take the furniture and the refusal.

Defendant in her testimony explains that her reason for refusing to sign the questionnaire was because it was stated in it that plaintiff was earning $1,500 a year, and was giving her $100 a month, whereas plaintiff had told her that he was earning from $300 to $400 a month, and was giving her only $12 a week. Her version of what took place when the government agent called upon her in connection with the questionnaire is as follows:

"A. Dr. Carter started to say something to that effect. He said, 'Just between us, didn't you say,' and then he started to say these things, 'if I give you the house,' and I said, 'Yes,' and that is all I said."

She assigns, as a reason for not occupying the room with plaintiff, that he had "always insulted" her.

She denies having come into plaintiff's room at night with a pistol.

Her only testimony with reference to her sister is as follows:

"Q. When your sister was in the city, did you and your husband ever go out with her? A. Yes, very often.

"Q. Where did you go? A. Downtown to a show and to supper."

She testifies that the furniture was hers; and that plaintiff gave her permission to take it; and that she left "an entire bedroom set."

She denies having told plaintiff that she "had a man"; and denies the interview with Mrs. Hall. She testifies that on the night of March 19, 1919,· when it is testified by plaintiff, the detective, and the Rousseaus that they saw a man go into, and come out of, her house at night, she entered her house at 6 o'clock, alone with her boy, and did not leave it that night, and that it is not true that a man came in the house that night.

She testified that often her husband would tell her that she was "no good," that her "house was immoral," in fact, "would call me such names that I would not repeat them. They are too vile to mention."

"The Court: Go ahead and repeat that. No doubt you have repeated that outside. You might as well repeat it here.

"A. I don't like to repeat them, Judge.

"Q. Go on and repeat what he said. A. He said that I was nothing but an old whore. He said that in the presence of my little boy."

On cross-examination, she admitted that two ladies who had been in the habit of visiting her house stopped doing so before her separation from plaintiff; but says it was because plaintiff insulted them. She admits having had a pistol in her room; but says it was plaintiff's. She left her husband in October, 1916. She admits that plaintiff had

bought the sewing room set; and a stove, safe, table, and two chairs for the kitchen. Further in the cross-examination she says that plaintiff purchased a dining room set and some kitchen furniture. She removed all this furniture, and insists that she had plaintiff's permission for doing so.

A witness for defendant, Mr. W. J. Rooney, testified that he was assistant cashier of the Whitney Central National Bank, and that on the night of March 19, 1919, he was with Oliver Hingle on Canal street from about 8 o'clock to about 1 o'clock, and that they two were joined there by a Mr. Melkie; that he remembers the date well because it was St. Joseph's day; that they went to Mr. Melkie's house and stayed there from 9:30 to 10 o'clock.

Mr. Michel M. Melkie is a member of the firm of Melkie Bros., tailors. He corroborates the testimony of Mr. Rooney to having been with Oliver Hingle on the night of March 19, 1919. He remembers that it was St. Joseph's day. He left the party between 11 and half past 11.

Oliver Hingle testified to the same facts, and denied that he had committed adultery with defendant.

Witnesses who had been visitors at the Carter house testified to his conduct there having always been what it should have been, and several witnesses testified to his good character, behavior, manners, etc.

One witness, a Miss Carter (not related to plaintiff), testified that she had been a frequent visitor at the Carter house, and that before the separation she had never heard defendant complain of her husband, but that after the separation defendant told her that "she was too good for him, he was not her equal."

Two notes were offered in evidence by plaintiff, in one of which defendant says:

"I want this thing (ended). I want my freedom and I tired of waiting. I would like to have it settled before school opens, as I will not send James to school until I know what * * * what."

And in the other:

"Will you give me the insurance policy, so I may have the address change, as I have all the furniture I don't think you will have any use for it." (Punctuation, spelling, and underscoring as in the letters.)

From the testimony as a whole it is very evident that the parties' living together has become insupportable, and that a separation from bed and board should be granted; and the question in the case must be as to which one of them the judgment should be given. and as to whether a divorce should be granted plaintiff, and as to the custody of the child.

Defendant's testimony is in flat contradiction with that of so many witnesses that very little weight can be attached to it. On the other hand, plaintiff is not contradicted in any particular, except by defendant. No reason is suggested why Mrs. Hall and Mr. Tarrantino should not be believed, except that it is said that the remarkable similarity in their reproduction of the expressions of defendant on the occasion in question is suspicious, tending to show an agreed upon story. The expressions, however, were short and sufficiently startling to impress themselves on the memory; so that there is no absolute reason why these two witnesses may not have been able to remember and repeat practically the very words themselves. What defendant is thus reported to have said accords with the opinion she is shown to have had of her husband, and with her desire to get rid of him. Except as coming from her own mouth, not a scintilla of evidence justifies her conduct towards her husband.

It would seem passing strange that the detective Campos and the two Rousseaus, the latter professional men, should have deliberately perjured themselves in the matter of

having seen a man enter defendant's house at night, so that we suspect strongly that the contradiction which, on the assumption that the man in question was Hingle, exists between their testimony and that of the two gentlemen with whom Oliver Hingle was on the night of St. Joseph's day, is to be explained by an error in the date; however, there is enough doubt in the matter to render the evidence too unreliable to serve as a basis for judgment.

Our conclusion is that plaintiff is entitled to judgment in separation from bed and board, and that in view of article 157, Civil Code, requiring the children of the marriage to be placed under the care of the party who has obtained the separation, unless for the greater advantage of the children and with the advice of a family meeting they are intrusted to the other party, and in view of the cloud which is left upon defendant by the testimony in the case, the custody of the child should be awarded to plaintiff.

It is therefore. ordered, adjudged, and decreed that the judgment appealed from be annulled; and that there now be judgment decreeing a separation from bed and board between plaintiff, James Francis Carter, and the defendant, Inez Melchior Carter, and that the said James Francis Carter be and he is hereby awarded the custody of the child James Francis Carter, Jr., issue of his marriage with the said Inez Melchior Carter; and that the defendant pay the costs of this suit.

### On Rehearing.

LAND, J. [1] We have re-examined the testimony in this case, and carefully weighed and considered the same, and we are convinced that the judgment of the lower court is correct. The trial judge saw the witnesses and heard them testify, and necessarily passed upon their credibility.

As the testimony in this case is conflicting, and as parts of plaintiff's testimony are highly suspicious and other parts wholly improbable, we find no good reason to disturb the conclusions reached by the trial judge. We agree with him that the charge of adultery against the defendant was not proven.

Our former decree is therefore set aside, and the judgment of the lower court affirmed, and made the final judgment of this court.

PROVOSTY, C. J., dissents.
O'NIELL, J., concurs in the result.

### On Application to Amend Judgment.

LAND, J. The judgment in this case was rendered Monday January 30, 1922, and has not yet been remanded for execution.

Plaintiff has filed an application in this case requesting the court to deny the alimony in toto, and, in the alternative, to reduce it from $25 a week to $83.50 per month, as the judgment below allowed the defendant alimony at the rate of $25 per week, in excess of the prayer in her rule.

[2] The judgment of which the plaintiff complains was rendered on rehearing, and no reservation was made therein for an additional application for rehearing. The judgment has become final as to the merits of the case, and this court is without jurisdiction to reopen its final judgments; although it may correct, after final judgment, mere clerical errors appearing therein. Levert v. Berthelot, 127 La. 1022, 54 South. 329; State v. F. B. Williams Cypress Co., 132 La. 949, 61 South. 988, Ann. Cas. 1914D, 1290.

The counsel for defendant also have requested the court in their supplemental brief, page 40, to correct, as a "clerical error in the judgment" of the lower court, the allowance of $25 per week as alimony awarded defendant, as such allowance was ultra petitionem; the amount of alimony claimed by defendant in her rule being the sum of $83.50 per month.

As both counsel for plaintiff and defendant have pointed out and requested the correction of this error, which is obvious, and which was inadvertently committed by the court in its last opinion and decree herein, in affirming the judgment appealed from, we feel that we need no other authority for its correction than the joint request of the parties themselves to this suit.

It is accordingly adjudged and decreed that the judgment herein rendered on January 30, 1922, be so amended and corrected as to decrease the alimony awarded defendant from $25 per week to $83.50 per month.

PROVOSTY, C. J., dissents, adhering to original opinion.